Filed 6/21/23  P. v. Aguilar CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ADRIAN AGUILAR,<br><br>    Defendant and Appellant. | G061323<br><br>(Super. Ct. No. 18CF1703)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Following a jury trial, Adrian Aguilar was convicted of two counts of sexual intercourse with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (a); counts 1 & 2)[1] and two counts of committing a lewd act upon a child under the age of 14 years (§ 288, subd. (a); counts 3 & 4). The trial court imposed concurrent terms of 25 years to life on the two counts of sexual intercourse. As for the two counts of lewd conduct, the court imposed and stayed six-year terms under section 654.

Aguilar's convictions arose from incidents on two separate nights in which 19-year-old Aguilar came home after partying with friends, woke up his 10-year-old stepsister C., sexually molested her, and told her not to tell anyone. More than a year later, a social worker was investigating an allegation of sexual abuse made by C.'s younger stepsister N. against their uncle. While this investigation was ongoing, C. confided in their mother (Mother) what Aguilar had done to her. When Mother confronted him, Aguilar denied C.'s accusations. However, when the police arrested him, he confessed.

Aguilar contends the trial court committed prejudicial error by including the following language in CALCRIM No. 358, an instruction addressing consideration of a defendant's out-of-court statements: "Consider with caution any statement made by the defendant tending to show his[]guilt unless the statement was written or otherwise recorded." Because his confession was recorded, Aguilar asserts this language should have been omitted from CALCRIM No. 358 because it implied the jury need not consider his recorded statement with caution but should believe it. He asserts instructing the jury with this language was "highly prejudicial" because he presented defense evidence and argument his confession was coerced and false. Even assuming the trial court erred, an issue we do not reach, we conclude any error was harmless.

---

[1] Subsequent statutory references are to the Penal Code unless otherwise stated.

2

Aguilar also asserts the trial court committed prejudicial error by excluding evidence he sought to present concerning the circumstances surrounding N.'s allegation of sexual abuse by their uncle. We find no abuse of the court's discretion as the jury heard significant portions of the evidence the defense sought to admit on this issue. We also reject Aguilar's claim of cumulative error, and we affirm the judgment.

FACTS

I.

PROSECUTION EVIDENCE

A. Background

In 2017, Aguilar lived in a three-bedroom house with his Mother, grandmother (Grandmother), stepsister C., and an aunt. Mother had shared custody of N. and another daughter (stepsisters to Aguilar and C.), who lived with Mother part time.

Aguilar and Grandmother slept on a bunkbed in one of the bedrooms. For a time, C. also slept in their bedroom, sleeping on the bunkbed's trundle.

B. Aguilar Molests C.

In the spring of 2017, C. was 10 years old. On a Friday night around the time of her spring break, C. was asleep in her bed when she heard Aguilar come into the bedroom. Grandmother was away that weekend.

Aguilar had been out partying with friends. C. woke up as Aguilar struggled to open the door and wobbled when he came into the room. Aguilar went to the bathroom and changed his clothes. He returned to the bedroom and told C. to take off her pajama bottoms and underwear. She complied. He pulled down his pants and got into bed with her. After using his hands to spread her legs, he put his penis against her vagina. After slight penetration, he thrusted for a few minutes. C. tried to wiggle away

3

and asked him to stop. Aguilar responded, "'Just wait a little more.'" Aguilar withdrew his penis and masturbated. He told her not to tell anyone.

The next night, a nearly identical incident occurred. C. awoke to find Aguilar had slid down her pajama bottoms and was on top of her in bed. Aguilar's pants were down as well. He put his penis inside her vagina and it hurt. Like the previous night, C. tried to wiggle away and asked him to stop. Aguilar did not respond. After a few minutes, he stopped. Again, he asked her not to tell anyone.

C.  Disclosures

Sometime later, C. asked N. to tell her a secret. N. disclosed their uncle, who had been staying at their house, had inappropriately touched her.

In June 2018, a social worker came to their house to investigate N.'s allegation their uncle had molested her. After the social worker left, C. told Mother and Grandmother what Aguilar had done to her. Mother confronted Aguilar with C.'s accusations. He denied them and suggested Mother take C. to a doctor to confirm he had not done anything to her.

When the social worker returned to their house about a week later, C. and Mother told the social worker Aguilar had molested C. The social worker called the police, who interviewed C. later that day. In her police interview, C. described the two incidents with Aguilar that had occurred on consecutive nights in 2017.

D.  Recorded Pretext Phone Call to Aguilar

After talking to C., police officers had Mother make a pretext phone call to Aguilar while he was at work.[2] They had Mother use a ruse during the call. Although it was not true, Mother told Aguilar she had taken C. to the doctor and the doctor said there

---

[2]  The phone call was recorded, and the recording was played for the jury.

were injuries to C.'s vaginal area that indicated someone had sex with her. When Mother asked Aguilar what he had to say about the doctor's findings, he responded he had already told her and inquired what else she wanted him to say. Multiple times during the nearly 20 minute phone call, Mother repeated the ruse and suggested Aguilar was using drugs when the incidents occurred and may not remember what he did to his sister. Aguilar repeatedly denied doing anything to C.

Mother urged Aguilar to tell her the truth. He replied she did not love him and wanted to send him to jail. Twice she asked him if it happened one time or many, and he responded he did not know and did not know anything about it. When asked a third time, Aguilar replied, "I said to you I don't remember." Aguilar told Mother he did not want to talk about it anymore and said he knew the police were going to arrest him. Mother continued questioning Aguilar and tried to get him to confess to molesting C.; he did not.

E. Aguilar's Arrest and Statement to the Police

Hours after the pretext phone call, police officers arrested Aguilar when he came home from work. Shortly after midnight, two officers questioned him in an interrogation room at the police station.[3] During the interview, Aguilar was handcuffed to the wall.

After advising Aguilar of his *Miranda*[4] rights, the officers urged him to be honest with them. Initially, Aguilar told the officers he did not remember what happened because he used to take Xanax pills, and when he did, he would sometimes blackout and not remember what happened. He explained that about a year or two prior to his arrest, he would take three to five Xanax pills at a time.

---

[3] Aguilar's interview was videotaped, and the video was played for the jury.

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

When the officers questioned Aguilar about the incident with C., he recounted he came home after taking pills and drinking with friends. He claimed he did not remember what he said to his sister when he got home and did not know what happened next. After the officers again urged him to be honest, Aguilar stated he remembered waking up C. and having her take off her clothes. He admitted he proceeded to put his penis inside her vagina but said he only put it in halfway because he did not want her to scream or to cause her pain. He had intercourse with her for about 10 minutes. Aguilar asserted during this time she did not tell him to stop nor try to move away from him.

Aguilar admitted the same thing occurred the next night when he came home after drinking with friends and taking pills. He told the officers both nights he pulled out and ejaculated on his shorts. He said both incidents occurred in the living room, where C. was sleeping, and both nights he told her not to tell anyone. He acknowledged he was 19 years old and C. was 10 years old when it happened.

F.  C.'s CAST Interview

About five days after Aguilar's arrest, C. was interviewed by a different social worker, who was a member of the child abuse services team (CAST).[5] At the time of her CAST interview, C. was 11 years old.

During the interview, C. described the two incidents with Aguilar. She said both occurred about a year prior, around the time of her spring break from school, when Grandmother was away. The first incident was on a Friday night when C. was sleeping on the bunkbed's trundle in the bedroom she shared with Aguilar and Grandmother. She heard Aguilar come into the bedroom and then go to the bathroom. He woke her up and told her to take off her pajama bottoms and underwear. She did so because she thought

---

[5]  C.'s CAST interview was recorded, and the recording was played for the jury.

6

he would get mad if she did not. He pulled down his pants and laid down on the bed with her. C. said Aguilar put his penis in her vagina "a little bit." She tried moving away from him because she wanted him to stop. When he stopped, he pulled his pants back up and went to his own bed. C. told the interviewer Aguilar did not masturbate afterwards and never told her to keep it a secret.

C. said Aguilar went out with his friends again the next night. When he came home, he was acting weird and almost tripped. She was in bed. Like the night before, he told her to pull down her pants and he put his penis inside her "a little bit." She moved around and told him to stop. Eventually, he stopped. She pulled up her pajamas, and he went to his bed. This time he told her not to tell anyone. C. explained she thought he did it because he was on drugs.

C. said she told Mother what happened because "something similar happened to [her] sister" with their uncle when he came to visit. C. informed the interviewer N. had confided in her their uncle inserted his fingers in her vagina, and C. had encouraged N. to tell Mother. After the social worker got involved because of the incident involving N. and their uncle, C. decided it was time to tell Mother what Aguilar had done to her.

G. C.'s Trial Testimony

C.'s testimony at trial was mostly consistent with her prior statements to the police and to the social worker at her CAST interview. At trial, however, she could not remember whether the second incident occurred the night after the first incident or whether it occurred two or three months later. In her CAST interview, C. said Aguilar did not masturbate after the incidents. But at trial, she testified he did. She explained she did not tell the complete truth during her CAST interview because she was trying to protect Aguilar. C. testified she finally disclosed to Mother what Aguilar did after she saw something on the news, not because of N.'s disclosure about their uncle.

7

## II.

### DEFENSE EVIDENCE

A.  Aguilar's Family

Grandmother testified she shared a bedroom with Aguilar but C. never slept in their bedroom; C. and her sisters slept in the living room.  Grandmother never saw anything inappropriate between C. and Aguilar.  Aguilar and C. had a good relationship in 2017, and their relationship did not change between 2017 and 2018.

Aguilar's female cousin moved in with the family sometime in 2017 and was living there when he was arrested in 2018.  During this time, C. slept on the bunk bed in the living room.  The cousin never saw anything inappropriate between Aguilar and C. and did not notice any change in their relationship between 2017 and Aguilar's arrest in 2018.  Aguilar had a good relationship with C. and his other stepsisters.  She did not believe the allegations against Aguilar.


B.  Aguilar's Testimony

Aguilar testified in his own defense and denied having any sexual contact with C.  He also denied ever taking Xanax or partying with friends and blacking out.

He testified C. never slept in the bedroom with him and Grandmother; C. and his stepsisters slept on the bunkbed in the living room.  One of his cousins moved into the house in 2016 or early 2017 and slept in the bedroom he shared with Grandmother.  After that cousin moved out, his other cousin moved into the house in 2017 and slept in the bedroom he shared with Grandmother.

Aguilar felt neglected by Mother, who was not very loving toward him when he was a child.  He believed she did not care about him as she gave all of her attention to his stepsisters.  In the spring of 2017, Aguilar was depressed and had suicidal thoughts.  This continued through the time of his arrest in 2018.

8

About two weeks prior to his arrest, Aguilar came home from work and Mother confronted him with C.'s accusations. He denied doing anything to C. and suggested Mother take C. to a doctor to confirm he had not.

The day of his arrest, Aguilar went to work at 5:00 a.m. and worked until 9:00 p.m. While he was at work, Mother called him (the pretext call). Although he denied C.'s allegations, Mother did not believe him and kept repeating the same questions. After the phone call, he felt frustrated, helpless, and emotional.

After he got home from work, two police officers arrived and arrested him. They took him to the police station, where he was placed in an interview room and handcuffed to a wall. He was scared and depressed and thought his life was over. In the interview, he told the officers what they wanted to hear but what he said was not true.

DISCUSSION

I.

CALCRIM NO. 358

The trial court instructed the jury with CALCRIM No. 358 as follows: "You have heard evidence that the defendant made oral statements before the trial/while the court was not in session. You must decide whether the defendant made any of these statements, in whole or in part. If you decide that the defendant made such statements, consider the statements, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statements. [¶] *Consider with caution any statement made by the defendant tending to show his*[]*guilt unless the statement was written or otherwise recorded.*" (Italics added.)

Aguilar argues the court committed prejudicial error by instructing the jury with the italicized language. He contends the implication of this language was that the jury need not consider his recorded confession to the police with caution but should instead believe it. He asserts this part of the instruction was "highly prejudicial in [his]

9

case" because it undercut his defense argument his confession was coerced and false. We disagree.

The language italicized above in CALCRIM No. 358 is a cautionary instruction applicable when a witness testifies to an oral out-of-court statement by the defendant that is used to show guilt. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1186.) The instruction "is concerned with the reliability and credibility of the witness who testifies about the defendant's statements" (*id.* at p. 1187) and is designed to aid the jury in determining whether the statement was in fact made (*id.* at p. 1186). When the defendant's statements are recorded, the cautionary instruction is unnecessary. (*People v. Xiong* (2020) 54 Cal.App.5th 1046, 1079-1080 ["cautionary instruction *should not* be given ""if the oral admission was tape-recorded""" and the jury heard the recording].) But the cautionary language may be appropriate if there is evidence the defendant made oral out-of-court incriminating statements that were not recorded. (*Id.* at p. 1080.) A trial judge does not have a duty to instruct with the italicized language sua sponte. (*People v. Diaz, supra*, 60 Cal.4th at p. 1190.) Instead, the defense should "make the strategic decision whether" to request the instruction because a defendant may not want the instruction given in all situations, i.e., when a defendant's statements include both inculpatory and exculpatory elements. (*Id.* at p. 1193.)

Here, the jury heard evidence Aguilar made recorded and unrecorded statements. His unrecorded statements included his commands to C. to take off her pajama bottoms, to wait when she asked him to stop, and not to tell anyone afterwards. Each of these unrecorded statements was inculpatory. Evidence was also presented concerning unrecorded exculpatory statements he made to the social worker and Mother when he denied C.'s allegations. As for his recorded statements, the jury heard the recording of Aguilar's confession to the police and the recording of his exculpatory statements to Mother in the pretext phone call. In total, the jury received evidence of both inculpatory and exculpatory statements by Aguilar, some of which were recorded

10

and some were unrecorded but recounted by witnesses. Thus, the cautionary language was applicable to some of Aguilar's statements and it was a defense strategic decision whether to request the cautionary language. (*People v. Diaz, supra*, 60 Cal.4th at p. 1193; see also Bench Notes to CALCRIM No. 358 ["If the jury heard both inculpatory and exculpatory . . . statements attributed to the defendant, give the [cautionary] paragraph"].)

The appellate record does not disclose whether the defense requested the court instruct the jury with this cautionary language in CALCRIM No. 358 or whether the court included the language in the absence of a defense objection.[6] Because no objection appears in the record, the Attorney General argues Aguilar has forfeited his instructional error claim. Aguilar contends we should reach the merits of his claim under section 1259, even in the absence of an objection, because the instructional error affected his substantial rights. Alternatively, he asserts if his trial counsel either requested the language or failed to object to it, his counsel rendered ineffective assistance, a violation of his rights under the state and federal constitutions.

We need not resolve the issues of forfeiture, ineffective assistance of counsel, nor whether the court erred by instructing the jury with the cautionary language in CALRIM No. 358, as any purported error was harmless. We reject Aguilar's contentions the asserted instructional error requires reversal of his convictions without a determination of prejudice or that prejudice must be assessed under the beyond a reasonable doubt standard in *Chapman v. California* (1967) 386 U.S. 18. Contrary to Aguilar's assertions, the inclusion of the cautionary language in CALCRIM No. 358 did not violate his federal constitutional right to due process or lower the prosecution's burden of proof. (See *People v. Diaz, supra*, 60 Cal.4th at p. 1195 ["Failure to give the

_____

[6] After multiple discussions between the court and counsel regarding the instructions to be given the jury, defense counsel indicated he was satisfied with the instructions. There was no discussion on the record concerning CALCRIM No. 358.

11

cautionary instruction is not a violation of federal due process"]; *People v. Xiong, supra*, 54 Cal.App.5th at p. 1081 [instructing with the cautionary language in CALCRIM No. 358 did not violate due process].)

The California Supreme Court has explained the cautionary language in CALCRIM No. 358 "does not conflict with the reasonable doubt instruction because the two instructions serve distinct purposes and aid the jury in different ways. The reasonable doubt instruction informs the jury that it must find the facts required for conviction to be proved with the specified level of certainty before it may convict the defendant. (CALCRIM No. 220.) The cautionary instruction, on the other hand, advises jurors that in deciding whether to believe a witness's testimony about the defendant's statements, they must exercise particular caution. The two instructions, together, inform the jury that it must determine whether each of the elements of the crime has been proved beyond a reasonable doubt, and that in making that determination it must exercise special caution in considering one particular type of evidence. [¶] Furthermore, nothing in the wording of the instructions would suggest to a jury that the cautionary instruction [in CALCRIM No. 358] was meant to apply in lieu of—rather than in addition to—the reasonable doubt instruction." (*People v. Diaz, supra*, 60 Cal.4th at p. 1188.) Aguilar does not contend the jury was misinstructed on the elements of the charged offenses or on the prosecution's burden to prove each element beyond a reasonable doubt. Moreover, it is well-established, "'Mere instructional error under state law regarding how the jury should consider evidence does not violate the United States Constitution.' [Citations]." (*People v. Xiong, supra*, 54 Cal.App.5th at p. 1081.) Thus, the cautionary language in CALCRIM No. 358, "given under the circumstances of this case and considered in the context of the instructions as a whole," did not so infect the trial as to constitute a due process violation. (*People v. Xiong, supra*, 54 Cal.App.5th at p. 1081.)

We agree with the Attorney General any purported error in the court's instruction with CALCRIM No. 358 is reviewed for prejudice under the standard set forth

12

in *People v. Watson* (1956) 46 Cal.2d 818.  We examine whether it is reasonably probable the jury would have reached a result more favorable to Aguilar if it had not been instructed with the cautionary language.  (*Id.* at pp. 835-836.)  "[W]e '"focus[] not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration."'  [Citation.]"  (*People v. Xiong, supra*, 54 Cal.App.5th at p. 1082.)  "'In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'  [Citations.]"  (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

Aguilar asserts "given the false confession defense [he] mounted here, the instruction had the potential" to confuse the jury.  He contends had the jury been properly instructed and not received the cautionary language "telling the jury, effectively, that it should believe the recorded confession, it was reasonably probable the jury would have found [him] not guilty."  We disagree.

Evaluating the language of CALCRIM No. 358 in its entirety, we conclude it is unlikely the jury would interpret the cautionary language in the manner suggested by Aguilar.  The cautionary language in CALCRIM No. 358 did not tell the jurors they must believe his recorded statements were credible and true.  The instruction told the jurors it was up to them "to decide how much importance to give to the statements."  The instruction, in its entirety, makes clear its purpose is to aid the jury in evaluating whether Aguilar made a statement attributed to him.

Aguilar's prejudice argument is premised on the cautionary language causing the jury to accept his confession as true simply because it was recorded.  But by this logic, the jury would have equally accepted his recorded exculpatory statements to Mother.

13

The jury would have understood it needed to evaluate all of Aguilar's statements—his out-of-court recorded and unrecorded statements, as well as his in-court testimony—and determine what was credible. Considering the instructions as a whole, it is not reasonably likely the jury interpreted the cautionary language in CALCRIM No. 358 to mean Aguilar's recorded out-of-court incriminating statements must be accepted as true and his exculpatory statements must be rejected. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1199 ["'we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled'"].) The court gave the jury other instructions to guide it in its assessment of witness credibility and determining whether statements, recorded or unrecorded, were credible and accurate. The jurors were instructed they alone must judge the credibility or believability of the witnesses, the factors to consider in evaluating the truth or accuracy of the witnesses' testimonies (CALCRIM Nos. 105, 200, 226), and how to evaluate conflicting evidence (CALCRIM No. 302).

Given the overwhelming evidence of Aguilar's guilt, it is unlikely the jury would have rejected Aguilar's confession but for the cautionary language in CALCRIM No. 358. The descriptions of the incidents Aguilar provided in his confession were consistent with C.'s testimony and her prior statements describing the two incidents. Aguilar's testimony the incidents never occurred and his confession was false had little credibility as he refused to answer questions about his confession. On the record in this case, it is not reasonably probable the jury would have reached a result more favorable to Aguilar had the court omitted the cautionary language in CALCRIM No. 358. Accordingly, any assumed error was harmless.

## II.

### EXCLUSION OF DEFENSE EVIDENCE

Aguilar contends the trial court committed prejudicial error by "excluding evidence of the full allegations against [C.'s] uncle and surrounding circumstances."

14

(Capitalization and boldface omitted.) He asserts this evidence "would have shown how [C.] could have gotten these ideas of molestation into her head, independent of actual molestation by" him. We conclude there was no abuse of the trial court's discretion.

A. Background

Prior to trial, Aguilar moved in limine to admit evidence concerning N.'s disclosure their uncle molested her while staying at their house. Aguilar argued the evidence was relevant to show why the social worker was at the home and provided a potential motive for why C. made up the accusations against him. Defense counsel explained the evidence was relevant to show C. was aware of N.'s accusation against their uncle and it "could have planted the seed in her head that [Aguilar] did the same, even if not true." Defense counsel attached to his motion and filed under seal confidential records concerning the social worker's investigation of N.'s allegation.

The prosecution objected to the admission of this evidence, arguing it should be excluded under Evidence Code section 352 because it would confuse the issues, mislead the jury, and would bring in "the whole case" concerning N.'s allegations. Defense counsel clarified he was not trying to open up the entire case concerning N.'s allegation and did not plan on calling her as a witness. He explained he was seeking to introduce evidence concerning C.'s possible state of mind through the social worker's testimony and what he was seeking to admit was "extremely limited."

The trial court ruled the defense could present evidence the social worker was at the house on an unrelated incident. But under Evidence Code section 352, the court excluded other evidence relating to the social worker's investigation of N.'s accusations, explaining the evidence the defense sought to admit was "too speculative" and would confuse the jury.

15

B.  Applicable Law

Under Evidence Code section 352, a trial court has broad discretion to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "We review the trial court's evidentiary decision for abuse of discretion, disturbing it only if we conclude that the trial '""""court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'"""" [Citation.]" (*People v. Parker* (2022) 13 Cal.5th 1, 53.)  "[W]e review the trial court's ruling, 'not the court's reasoning and, if the ruling was correct on any ground, we affirm.' [Citations.]" (*People v. Camacho* (2022) 14 Cal.5th 77, 123.)


C.  The Trial Court Did Not Abuse Its Discretion

Aguilar contends the court erred by excluding the evidence he sought to admit concerning the social worker's investigation of N.'s allegation against the girls' uncle.  He asserts Evidence Code section 352 was not a bar to admission because the evidence was relevant and not overly prejudicial to the prosecution.  He further argues the error was prejudicial to him because he was unable to get into the similarities between N.'s allegations against their uncle and C.'s accusations against him.  Aguilar's argument is not persuasive as it overlooks the evidence on that subject admitted at trial.

Although the court excluded some evidence of the social worker's investigation of N.'s allegation when it ruled on the in limine motion prior to trial, ultimately, the jury heard the fundamental pieces of evidence the defense sought to admit.  During the trial, Mother testified a social worker came to her house in June 2018 to talk about an incident concerning N. and Mother's brother (the girls' uncle).  The jury viewed the recording of C.'s CAST interview, during which C. stated N. told her their uncle had inserted his fingers in her vagina and the social worker got involved because of this

16

incident. C. said she decided to tell Mother what Aguilar had done to her after the social worker left their house. At trial, Mother testified at the time of the social worker's involvement, she was giving a lot of attention to N. because of N.'s allegations concerning the girls' uncle. Thus, contrary to Aguilar's contention, the jury did hear evidence suggesting how C. "could have gotten into her head ideas of molestations without molestation actually occurring." This evidence also showed C. had a motive for making the accusations against Aguilar, as she saw N. getting a lot of attention from Mother. Furthermore, the evidence indicated Mother had a motive in advocating for C., given social services involvement in the other investigation. Accordingly, we find no abuse of the trial court's discretion.

III.

CUMULATIVE ERROR

Aguilar contends the combination of the instructional and evidentiary errors in his trial deprived him of his federal constitutional right to due process and the cumulative prejudice of these errors warrants the reversal of his convictions. We disagree.

"'Under the cumulative error doctrine, the reviewing court must "review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence."' [Citation.] 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."' [Citation.]" (*People v. Mireles* (2018) 21 Cal.App.5th 237, 249.)

We have concluded there was no evidentiary error and assumed instructional error for purposes of our analysis. Thus, there is no cumulative error effect to assess. Nevertheless, even when considered together, Aguilar's purported errors do not rise to the level of prejudicial error. It is not reasonably probable the result of Aguilar's trial would have been different in their combined absence given the

17

overwhelming evidence of his guilt.  We conclude Aguilar received due process and a fair trial and the cumulative effect of any errors does not rise to the level of prejudice necessary to reverse Aguilar's convictions.

## DISPOSITION

The judgment is affirmed.


MOTOIKE, J.

WE CONCUR:


O'LEARY, P. J.


SANCHEZ, J.

18